# EXHIBIT B

Ira Scot Meyerowitz (IM 2449)
Jon D. Jekielek (JJ 0536)
Meyerowitz Jekielek PLLC
347 Fifth Avenue
Suite 1300
New York, New York 10016
Tel: (212) 686-7008
Fax: (212) 686-7113

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

ALLGOOD ENTERTAINMENT, INC.,
and ALLGOOD CONCERTS, LLC,

     **AMENDED COMPLAINT**

    Plaintiff,

     Case No.: 09 CV 5377 (HB)

  vs.

JOHN BRANCA and JOHN McCLAIN
as Special Administrators of the ESTATE OF
MICHAEL JACKSON, DILEO ENTERTAINMENT
AND TOURING, INC., FRANK DILEO, an individual;  Plaintiffs Demand a
ANSHUTZ ENTERTAINMENT GROUP,    Trial by Jury
AEG LIVE, LLC, AEG LIVE NY, LLC.,

    Defendants.
-----------------------------------------------------------x

  Plaintiffs AllGood Entertainment, Inc. and AllGood Entertainment, LLC

(collectively "AllGood" or "Plaintiffs"), by their attorneys, Meyerowitz Jekielek PLLC,

as and for their Complaint against defendants John Branca and John McClain as Special

Administrators of the Estate of Michael Jackson (the "Jackson Estate"), Dileo

Entertainment and Touring, Inc. ("Dileo Entertainment"), Frank Dileo ("Dileo"), Anshutz

Entertainment Group ("Anshutz"), AEG Live, LLC ("AEG 1"), and AEG Live NY, LLC

("AEG 2") (collectively, "Defendants") allege as follows:

## THE PARTIES

1. AllGood Entertainment, Inc. was and is a corporation duly organized and existing under the laws of New Jersey with its principal place of business located in the State of New Jersey, Morris County.

2. AllGood Concerts, LLC was and is a limited liability corporation duly organized and existing under the laws of New Jersey with its principal place of business located in the State of New Jersey, Morris County.

3. Upon information and belief, Anshutz was and is a corporation duly organized and existing under the laws of the State of Delaware, with its principle place of business located at 145 West 45th Street, Suite 9, New York, NY 10036.

4. Upon information and belief, AEG 1 and AEG 2 were and are limited liability corporations both of which are duly organized and existing under the laws of the State of Delaware with their principal places of business located at 5750 Wilshire Blvd., Suite 501, Los Angeles CA 90036, and doing business in New York at offices located at 111 Eighth Avenue, New York, NY 10011. Anshutz, AEG 1 and AEG 2 are collectively referred to herein as "AEG."

5. Upon information and belief, Michael J. Jackson ("Jackson") died testate on or about June 25, 2009, and at the time of his death resided in the State of California, Los Angeles County.

6. Upon information and belief, on or about July 1, 2009, probate proceedings commenced for the disposition of the Estate of Michael J. Jackson in the Los Angeles Superior Court and are proceeding under Case No. BP117321 (the "Jackson Probate Action").

2

7.   Upon information and belief, the Jackson Estate was established on or about July 6, 2009, when John Branca and John McClain were appointed Special Administrators of the Estate of Michael J. Jackson and legally appointed Administrators of the assets and debts of Michael J. Jackson in the Jackson Probate Action and that said Special Administrators are entitled under court supervision, to administer the assets of Michael J. Jackson as a deceased person pursuant to Probate Code section 6400 et seq, including personal and real property, wheresoever situated, and to represent Michael J. Jackson's estate in legal proceedings.

8.   Upon information and belief, Dileo Entertainment was and is a corporation duly organized and existing under the laws of the State of Tennessee, with an office located at 2 Music Circle South, Suite 208, Nashville, TN 37203.

9.   Upon information and belief, Dileo is an individual who is a resident of the State of Tennessee and is CEO of Dileo Entertainment.  Dileo and Dileo Entertainment are collectively referred to herein as the "Dileo Defendants."

10. Except as hereinafter specifically described, Defendants, and each of them, were and are acting in concert or participation with each other, or were joint participants and collaborators in the acts complained of, and were the agents, alter egos, and/or employees of the others in doing the acts complained of herein, each and all of them acting within the course and scope of said agency and/or employment by the others, each and all of them acting in concert one with the other and altogether.

3

## JURISDICTION AND VENUE

11. This Court has subject matter, i.e., diversity jurisdiction, over this action pursuant to 28 USC § 1332(a)(1) as the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and this controversy is between citizens of different states.

12. Venue is proper pursuant to 28 USC §1391(a) and this Court has personal jurisdiction over the parties on the grounds that: (i) a substantial part of the events and/or wrongful conduct that give rise to the claims alleged herein occurred in this District; (ii) AEG's principal place of business is in this District; (iii) the Dileo Defendants agreed to jurisdiction herein pursuant to an agreement, as discussed in greater detail below; and (iv) all of Defendants are doing business in New York.

13. This Court has personal jurisdiction over the Dileo Defendants and Jackson c/o the Jackson Estate on the grounds that, upon information and belief: (i) Dileo was the manager and, therefore, an agent of Jackson, acting on Jackson's behalf in connection with all of the events and transactions set forth in this Complaint, thereby rendering Jackson subject to any personal jurisdiction to which the Dileo Defendants are subject; (ii) a substantial part of the events and/or transactions that give rise to the claims alleged herein occurred in this State, i.e., *inter alia*, telephone calls between the parties, meetings between the parties, activities in connection with the negotiations, execution and breach of the relevant agreements by and between the Dileo Defendants and Plaintiff, activities in connection with the negotiations, execution, production, marketing and promotional activities for and payments and monies received under the relevant agreements with AEG to be held in London, agreements, meetings and telephone call by and between the Dileo

4

Defendants and third parties, Plaintiff and/or AEG in connection with the production,
marketing and promotion of Plaintiff's and/or AEG concerts; (iii) the Dileo Defendants,
on behalf of themselves and Jackson, explicitly agreed in writing to jurisdiction herein
pursuant to an agreement with Plaintiff, as discussed in greater detail below; and (iv)
Dileo Defendants and Jackson c/o the Jackson Estate were and are doing business in New
York, generally, and in connection with the events and transactions that give rise to the
claims alleged herein, as set forth herein.

## FACTUAL ALLEGATIONS

### The Main Players

14. Patrick Allocco ("Allocco") is the president and CEO of AllGood, companies
that promote live events, including but not limited to concerts, festivals and personal
appearances, featuring internationally known performing artists.

15. Upon information and belief, Jackson is a critically acclaimed, multi platinum,
award winning performing artist known throughout the world.  Jackson, along with his
siblings, Janet Jackson, Tito Jackson, Jermain Jackson, Marlon Jackson, Randy Jackson,
and Jackie Jackson collectively comprise a family of world renowned performing artists
(collectively referred to herein as the "Jackson Family").

16. Upon information and belief, Dileo is the president and CEO of Dileo
Entertainment (collectively the "Dileo Defendants") and was the personal manager of
Jackson for many years, including at all relevant times herein.

17. Upon information and belief, AEG is one of the leading providers of live
entertainment and sports in the world and, in fact, the second largest concert promotion,
special event and touring company in the world.

**Dileo's Representations, Dileo's Authority and the Agreements**

18. On or about October 21, 2008 Allocco flew to Las Vegas, Nevada for a meeting with Joe Jackson, the father of Jackson and the Jackson Family.

19. At the meeting, in which various persons attended, Allocco spoke with Joe Jackson about his desire to promote a major concert featuring the return of Jackson and/or a Jackson Family reunion through his company AllGood (the "Event").

20. Joe Jackson informed Allocco that he really hoped to produce the Event, it would be best to reach out to Dileo, because Dileo was Jackson's then-current manager.

21. In fact, upon information and belief, Dileo was then and still is generally known in the music industry to be a long-time former and current manager of Jackson and/or the Jackson Family. Up to the date of this Complaint, and as recently as last week, Dileo and other reliable sources were quoted in several media sources as stating that Dileo was and still is Jackson's manager.

22. Allocco's reliance on this industry-wide knowledge, as well as Dileo's representations in the media, was reasonable in support of his belief that Dileo was Jackson's manager and that Dileo had the express and/or implied authority to bind Jackson to any such agreement as Allocco was proposing.

23. Shortly after Allocco's business trip to Las Vegas, an associate of Allocco set up an appointment for Allocco to meet with Dileo.

24. On or about November 20, 2008, Allocco met with Dileo and another representative of Dileo Entertainment at a restaurant in Nashville, Tennessee.

6

25. At the meeting, Allocco reiterated to Dileo his desire and ability to promote a one time concert in the United States featuring Jackson and/or the Jackson Family, and even suggested the idea of a making it a Pay Per View event, i.e., the Event.

26. Allocco informed Dileo that he had investors who would be willing to invest in such a concert.

27. At the meeting, Dileo confirmed and represented that he was in fact Jackson's manager, and that he believed he could make the Event a reality

28. Further, Dileo stated that he had already spoken to Jackson about Allocco's idea of doing a concert featuring Jackson and/or the Jackson Family and that Jackson was very interested in the Event.

29. The following day, Dileo and Allocco met again, this time at the offices of Dileo Entertainment.

30. During this second meeting, Allocco once again asked Dileo directly and explicitly if he had the authority and the power to bind Jackson and/or the Jackson Family to an agreement requiring them to perform.

31. Dileo responded with a resounding and explicit "yes." Dileo went further, bragging that he spoke with Jackson nearly everyday and that he recently finished closing a movie deal on behalf of Jackson.

32. In reliance of the representations made by Dileo, AllGood and the Dileo Defendants entered into two agreements which, as described in detail below, essentially provide that the Dileo Defendants were the acting managers for Jackson, duly authorized to engage Jackson for a concert performance, that AllGood would be the exclusive producer and promoter of a Jackson and/or the Jackson Family concert on a date to be

7

determined, but to be scheduled sometime in the summer of 2009, and, most importantly, that neither the Dileo Defendants nor Jackson and/or the Jackson Family would agree to do a concert with any other person or entity at any time prior to the 2009 summer concert and for a period of three months after said concert.

### AllGood's Efforts, the Breach of the Agreements and AEG's Interference

33. Subsequently, Allocco and AllGood went to work to produce and promote the concert and gather investors and financing.

34. During many long months following the agreements, Allocco and representatives of his company, AllGood, crisscrossed the country meeting with persons and entities interested in investing in the concert, promoters, agents and other industry insiders in a good faith attempt to live up to AllGood's obligations under the agreements and to produce a once in a lifetime concert event.

35. As a result of all this feverish activity, AllGood incurred significant expenses and passed by numerous opportunities.

36. In addition, during these months, Allocco spoke with Dileo on a regular basis and almost daily with Dileo's business associate, Mark Lamicka, and met with Dileo on several occasions; once where Dileo purported to call upon Jackson in Allocco's presence.

37. During this time, Dileo continued to represent to AllGood and Allocco that he was still an influential member of Jackson's small inner circle of advisors, that Jackson wanted to do the concert, that he would produce Jackson and that the concert would go on as the parties agreed.

8

38. In reliance on these continuing assurances, Allocco worked diligently and successfully lined up investors who were ready, willing and able to invest in the concert and provide funding to the Dileo Defendants.

39. At some point it became apparent that the Dileo Defendants were not acting in good faith, and, despite extensions of time to act, could or would not follow through on their obligations under the parties' agreements.

40. Subsequently, AllGood learned that, despite their contractual obligations not to circumvent AllGood, Jackson and Dileo had secretly teamed up with AEG to produce a concert or series of concerts in London, and perhaps a Pay Per View of Jackson Family reunion event.

41. Upon information and belief, AEG knew of the agreement between AllGood, the Dileo Defendants and Jackson, but due to their dominance and power in the live performance industry, coerced and/or induced Dileo and Jackson to disregard the agreements with AllGood and to work with it instead.

42. Up to the date of this Complaint, numerous press releases have been published, which confirm that Jackson intends to move forward with AEG, Dileo as Jackson's acting manager, and AEG as the promoter and producer of the London shows, and perhaps other domestic shows.

43. Defendants have not offered, nor have they made any attempts to include AllGood in the London and/or other concerts and plans concerning Jackson and/or the Jackson Family.

44. Since the filing of the original Complaint in this action, Jackson died, but Defendants were able to record, film, edit, produce, market, advertise and prepare for

release and sale and screening in movie theaters, *inter alia*: (i) a feature length movie of Jackson's dress rehearsal that was filmed and recorded in preparation of Jackson's London concert series; and (ii) a CD and DVD compilation of previously unreleased released songs and dress rehearsal filmed and recorded in preparation of Jackson's London concert series.

45. But for Jackson and the Dileo Defendants breach of the agreements with Plaintiffs, and AEG's malicious, willful and intentional interference with the Dileo Defendants and Jackson's agreement with Plaintiffs, as set forth in detail herein, the Jackson Estate, the Dileo Defendants, and AEG would not be reaping the benefits of the foregoing movie, DVD and CD, to Plaintiffs' detriment, which is estimated to generate revenues for Defendants in the amount of hundreds of millions of dollars. Pursuant to Plaintiffs' claims herein, Plaintiffs are entitled to a significant percentage of said revenues, if not a complete disgorgement of all profits generated from said sales.

## COUNT I
## **BREACH OF CONTRACT**

46. Plaintiffs hereby incorporate by reference each and every allegation set forth in paragraphs 1 through 45 of this Complaint as though fully set forth herein.

47. As set forth in detail above, Dileo was a duly authorized manager and/or agent of Jackson, with actual and/or apparent authority to enter into agreements on Jackson's behalf with respect to booking Jackson for a concert performance.

48. Despite being fully aware of the agreements herein and AllGood's actions in reliance on Dileo's representations, neither Jackson nor any of his representatives ever notified AllGood that Dileo was not Jackson's manager and/or authorized to act on his behalf.

10

49. To the contrary, AllGood learned through the press, third-parties, industry insiders and persons close to Jackson that Jackson approved of the Event and Dileo was Jackson's acting manager.

50. On or about November 25, 2008, AllGood and the Dileo Defendants, acting as duly authorized agents and representatives for Jackson and/or the Jackson Family, duly entered into and executed a written agreement whereby AllGood would promote a concert featuring performances by Jackson and the Jackson Family tentatively titled "The Jackson Family Reunion: A Concert for the World" in the summer of 2009 (the "Event") in consideration for the fee of Twenty Four Million ($24,000,000.00) Dollars (the "Binder Agreement").

51. The Binder Agreement signed by the Dileo Defendants, on behalf of Jackson and the Jackson Family, states as follows: "ARTIST/S [i.e. Jackson and/or the Jackson Family] represents and warrants that ARTIST/S is under no disability, restriction, or prohibition, whether contractual or otherwise, with respect to ARTIST/S right to execute this contract and perform its terms and conditions with respect to ARTIST/S right to appear."

52. Upon information and belief, the Dileo Defendants and/or Jackson breached this provision because Jackson was under a disability, restriction or prohibition that prevented him from performing the terms of the Binder Agreement.

53. Further, the Binder Agreement granted AllGood exclusive rights to produce the Event with Jackson and/or the Jackson Family.

54. In this regard, the Binder Agreement contained a non-compete provision wherein Jackson and/or the Jackson Family "agree not to consider or agree to perform on stage prior to the Event."

55. Moreover, Jackson agreed not to perform, individually, for at least three (3) months after the Event and the Jackson Family agreed not to perform together for at least one (1) year following after the Event.

56. As discussed in detail above, the Dileo Defendants and Jackson breached exclusivity, non-compete terms of the Binder Agreement by, *inter alia*, agreeing, filming, recording, marketing and preparing for release CDs, DVDs and a movie in connection with the London shows for the summer of 2009 and/or any other performance obligations of which AllGood is currently unaware during this approximately eighteen (18) month "blackout period."

57. The Binder Agreement provides that the "persons signing for ... the ARTIST/S [i.e., the Dileo Defendants] agree to be personally, jointly and severally liable for the terms of this contract."

58. On or about November 26, 2008, AllGood, Dileo and Dileo Entertainment, acting as duly authorized agents and representatives for Jackson and/or the Jackson Family, duly entered into and executed a written Confidentiality and Non-Disclosure Agreement which was to run for a term of eighteen (18) months from the date of the NDA Agreement ("NDA Agreement").

59. The NDA Agreement incorporated and referenced the subject matter of the Binder Agreement (collectively the Binder Agreement and the NDA Agreement are collectively referred to herein as the "Agreements").

60. Further, the Dileo Defendants agreed in the NDA Agreement to apply New York law and to submit to the jurisdiction of New York State for purposes of any breach of said agreements.

61. The NDA Agreement had a non disclosure clause whereby the Dileo Defendants agreed not to use any information prepared and/or provided by AllGood in connection with the Event.

62. Upon information and belief, the Dileo Defendants breached the foregoing provision by, *inter alia*, disclosing information prepared and/or provided by AllGood to third-parties including AEG.

63. The NDA Agreement contained a non-circumvention clause which provides that the Dileo Defendants agree not to circumvent AllGood with respect to potential lenders, investment banking institutions, financial parties, financing sources, potential investors, strategic alliances, strategic partners, investor group or other financial/transactional/business relationship or business opportunity introduced to [the parties] for consideration to provide such financing to the [parties]" with respect to the Event. Moreover, the parties agreed that they "shall not use any information prepared by the [parties] to secure financing or transactions independently of" AllGood and in connection with the Event.

64. Furthermore, the NDA Agreement contained a non-compete clause which provides that "[f]or a period of 18 months from the date first written above [November 26, 2008], the Parties [i.e., Jackson and Dileo] shall not, directly or indirectly, solicit or contract in an effort to do business with any person or entity who was in any manner associated with the Event during the term of this agreement."

13

65. As discussed in detail above, the Dileo Defendants and Jackson breached non-circumvention and non-compete terms of the NDA Agreement by, *inter alia*, agreeing to do the London shows this summer of 2009, the dress rehearsal CDs, DVDs, and movie and/or any other performance obligations of which AllGood is currently unaware during this approximately eighteen (18) month "blackout period."

66. As set forth in detail above, with full knowledge and intent, the parties duly negotiated and entered into the Dileo Agreements and Dileo had the actual and apparent authority to bind Jackson to the Dileo Agreements.

67. As a result of the foregoing breaches of the Agreement, the Dileo Defendants and Jackson caused Plaintiffs to suffer financial damages and loss of earnings.

68. Plaintiffs fully performed in accordance with the terms of the Agreements.

69. The Dileo Defendants and the Jackson Estate have no defense for their breaches of the foregoing agreements and yet they refuse to make Plaintiff whole.

70. Accordingly, Plaintiffs are entitled to an award of compensatory damages in an amount to be determined at the trial, but in no event less than Three Hundred Million ($300,000,000) Dollars, which amount includes, but is not limited to: (i) the commissions and fees AllGood would have received under the Agreements, (ii) loss of profits AllGood would have received under the Agreements; (iii) reimbursement of the expenses AllGood incurred pursuant to and in reliance on the Agreements; (iv) loss of business opportunities AllGood forwent in its commitments under the Agreements; (v) a significant portion of any all moneys Defendants would reap on the CDs, DVDs, and movie, and (v) all pre- and post-judgment interest, costs and attorneys fees.

14

71. Furthermore, the NDA Agreement provides that in case of a breach of this agreement then the non-breaching party shall be entitled to attorneys' fees. Accordingly, Plaintiffs are entitled to an award of all attorneys fees incurred herein.

## COUNT II
## PROMISSORY ESTOPPEL

72. Plaintiffs hereby incorporate by reference each and every allegation set forth in paragraphs 1 through 71 of this Complaint as though fully set forth herein.

73. As described in detail above, the Dileo Defendants, individually, and on behalf of Jackson, made unambiguous and false promises to AllGood that AllGood would be the exclusive producer and promoter of a Jackson and/or Jackson Family concert during the period of 2009 to 2010.

74. At all times, the Dileo Defendants and Jackson knew that AllGood was reasonably relying upon their promises and foregoing other clients and opportunities due to their commitments to the Event.

75. As a result, AllGood relied to its detriment upon the promises, assurances and representations of the Dileo Defendants and Jackson by, among other things, incurring expenses and by foregoing other business opportunities.

76. Based upon AllGood's reasonable reliance on the foregoing representations, the Dileo Defendants and Jackson are estopped from repudiating and/or denying the terms of the agreements described above.

77. Accordingly, Plaintiffs are entitled to an award of compensatory damages in an amount to be determined at the trial, but in no event less than Threes Hundred Million ($30000,000) Dollars, which amount includes, but is not limited to: (i) the commissions and fees AllGood would have received under the Agreements, (ii) loss of profits AllGood

15

would have received under the Agreements; (iii) reimbursement of the expenses AllGood incurred pursuant to and in reliance on the Agreements; (iv) loss of business opportunities AllGood forwent in its commitments under the Agreements; and (v) all pre- and post-judgment interest, costs and attorneys fees.

## COUNT III
## FRAUD

78. Plaintiffs hereby incorporate by reference each and every allegation set forth in paragraphs 1 through 74 of this Complaint as though fully set forth herein.

79. As described in great detail above, the Dileo Defendants knowingly and fraudulently induced AllGood into entering into the Agreements by making misrepresentations of material fact to Plaintiffs and/or failing to disclose material facts to AllGood, despite having a duty to do so, such that the Dileo Defendants' representations were false representations.

80. Upon information and belief, the Dileo Defendants knew at the time they made those representations that they were factually false and that they had no intention of abiding by them as evidenced by the fact that they entered into agreements with AEG to produce the Event and/or concerts with Jackson, despite having no right to do so under the Agreements.

81. AllGood relied to its detriment upon the Dileo Defendants' failure to disclose material facts, omissions of material facts, promises, assurances, and representations by, among other things, incurring significant costs and expenses to produce and promote the Event and by foregoing other business opportunities.

16

82. At all times, the Dileo Defendants knew that AllGood was reasonably relying upon their representations and/or omissions of material facts and foregoing other options and opportunities due to their commitments to Dileo Defendants under the Agreement.

83. Accordingly, Plaintiffs are entitled to an award of compensatory damages in an amount to be determined at the trial, but in no event less than Three Hundred Million ($3000,000) Dollars, which amount includes, but is not limited to: (i) the commissions and fees AllGood would have received under the Agreements, (ii) loss of profits AllGood would have received under the Agreements; (iii) reimbursement of the expenses AllGood incurred pursuant to and in reliance on the Agreements; (iv) loss of business opportunities AllGood forwent in its commitments under the Agreements; and (v) all pre- and post-judgment interest, costs and attorneys fees.

84. In light of the malicious, intentional and/or willful nature of Defendants' actions, Plaintiffs are entitled punitive damages in an amount to be determined at trial, but believed to be in excess of Three Hundred Million ($300,000,000) Dollars.

## COUNT IV
## TORTIOUS INTERFERENCE WITH A CONTRACT

85. Plaintiffs hereby incorporate by reference each and every allegation set forth in paragraphs 1 through 84 of this Complaint as though fully set forth herein.

86. AllGood and the Dileo Defendants, individually and on behalf of Jackson, entered into the Agreements and/or prospective business relationships wherein AllGood had a reasonable expectation that it would receive an economic benefit from the Agreements and prospective business relationships.

87. As described in detail above, upon information and belief, AEG deliberately, intentionally, and knowingly induced Jackson and the Dileo Defendants to breach and

repudiate the Agreements and/or terminate their prospective business relationships with AllGood.

88. Upon information and belief, AEG induced the Dileo Defendants and Jackson to engage AEG to promote and produce a concerts series in London scheduled to begin in the summer of 2009, instead of doing a Jackson family reunion or Jackson return concert series and/or Pay Per View special with AllGood.

89. Upon information and belief, AEG had actual and/or constructive knowledge of the Agreements and/or prospective business relationships and AllGood's expectancy to incur a financial benefit from the Agreements and/or prospective business relationships.

90. In fact, AllGood served AEG with a cease and desist letter, putting AEG on notice of the Agreements and demanding that AEG cease and desist from interfering with the Agreements.

91. Had AEG not induced the Dileo Defendants and Jackson to breach the Agreements, AllGood would have received the anticipated economic advantage of the Agreements and/or prospective business relationships with the Dileo Defendants and Jackson, thereby causing AllGood to suffer significant financial loss.

92. Accordingly, Plaintiff is entitled to an award of compensatory damages in an amount to be determined at the trial, but in no event less than Three Hundred Million ($300,000,000) Dollars, which amount includes, but is not limited to: (i) the commissions and fees AllGood would have received under the Agreements, (ii) loss of profits AllGood would have received under the Agreements; (iii) reimbursement of the expenses AllGood incurred pursuant to and in reliance on the Agreements; (iv) loss of business

opportunities AllGood forwent in its commitments under the Agreements; and (v) all pre- and post-judgment interest, costs and attorneys fees.

93. In light of the malicious, intentional and/or willful nature of AEG's actions, Plaintiffs are entitled punitive damages in an amount to be determined at trial, but believed to be in excess of Three Hundred Million ($300,000,000) Dollars.

**COUNT V**

**PERMANENT INJUNCTION**

94. Plaintiffs hereby incorporate by reference each and every allegation set forth in paragraphs 1 through 93 of this Complaint as though fully set forth herein.

95. As set forth above, despite the Agreements, Defendants are proceeding with Jackson concerts, despite having no lawfully right or authority to do so.

96. As a result, Plaintiffs have suffered and continues to suffer permanent, imminent and irreparable harm.

97. Plaintiffs have no adequate remedy at law.

98. Accordingly, for the foregoing reasons, Plaintiffs are entitled to an order enjoining Defendants from producing, performing and promoting the Jackson concerts schedule for the summer of 2009, or at any time during the "blackout period."

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs pray for relief on the counts stated above as against Defendants as follows:

19

a.    On the First through Fourth Counts, that Plaintiffs be awarded compensatory damages in an amount to be determined at trial and which is otherwise incalculable at this time, but is not less than Three Hundred Million ($300,000,000) Dollars;

b.    On the Third and Fourth Counts, that Plaintiffs be awarded punitive damages in an amount to be determined at trial, but in no event less than Three Hundred Million ($300,000,000) Dollars;

c.    That Plaintiffs be awarded its attorneys' fees as provided for under the NDA Agreement and under the common law;

d.    That Plaintiffs be awarded pre- and post-judgment interest cost and disbursements; and

e.    That Plaintiffs be awarded all other and further relief as the Court may deem just and proper.

Date:  New York, New York
       October 15, 2009

                    MEYEROWITZ JEKIELEK PLLC

                    By:_____/s/_____
                        Ira Scot Meyerowitz (IM 2449)
                        Jon D. Jekielek (JJ 0536)
                    347 Fifth Avenue
                    Suite 1300
                    New York, New York 10016
                    Tel: (212) 686-7006
                    Fax: (212) 686-7113

                    *Attorneys for Plaintiffs*