UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
ALLGOOD ENTERTAINMENT, INC. and                 :
ALLGOOD CONCERTS, LLC,                          :
                                                :
                      Plaintiffs,       :
                                                :       09 Civ. 5377 (HB)
       - against -                             :
                                                :       OPINION &
DILEO ENTERTAINMENT AND TOURING, INC.,          :       ORDER
FRANK DILEO, and JOHN BRANCA                    :
and JOHN MCCLAIN, Special Administrators of the :
Estate of Michael Jackson,                      :
                                                :
                      Defendants.       :
------------------------------------------------------------------------x

**Hon. Harold Baer, Jr., District Judge:**

       In this case, plaintiffs AllGood Entertainment, Inc. and AllGood Concerts, LLC ("Plaintiffs" or "AllGood"), bring suit for breach of contract and promissory estoppel based on a failed plan to put together and promote a concert featuring Michael Jackson and his siblings.[1] AllGood claims that, in November 2008, they entered into a binding contract with defendants Dileo Entertainment and Touring, Inc. and Frank Dileo (collectively "Dileo Defendants") for a concert featuring Jackson[2] and his siblings, and that the contract was breached with resulting damage to Plaintiffs, when Jackson signed an agreement in January 2009 with another concert promoter, AEG. Plaintiffs also brings suit against John Branca and John McClain, Special Administrators of the Estate of Michael Jackson,[3] ("Estate Defendant;" both sets of defendants hereafter "Defendants") because they claim that Jackson authorized Dileo Defendants to sign the contracts on his behalf. Defendants move for summary judgment on a variety of grounds, and, for the reasons that follow, their motion is GRANTED and the case is dismissed.

---

[1] Jackson had eight siblings: Janet Jackson, Tito Jackson, Jermaine Jackson, Marlon Jackson, Randy Jackson, Jackie Jackson, LaToya Jackson, and Rebbie Jackson. Dileo Defendants' R. 56.1 stmt. of Mat. Facts ("Dileo 56.1"), ¶ 2 n.2.
[2] "Jackson" only refers to Michael Jackson, and any other member of the Jackson family will be named in full.
[3] Jackson died in June 2009.

1

## I.   BACKGROUND[4]

The genesis of this failed performance agreement arose out of a meeting between a group of individuals, including Patrick Allocco, CEO of AllGood Entertainment and Joe Jackson, Jackson's father, in Las Vegas, Nevada in October, 2008.  Stmt. of Undisputed Mat. Facts in Supp. of the Mot. For Summ. J. by John Branca and John McClain as Special Administrators of the Estate of Michael Jackson ("Estate 56.1"), ¶ 2; Pls.' R. 56.1 Counter-Stmt. of Undisputed Facts in Opp. To Defs.' Mot. for Summ. J. ("Pls.' 56.1") ¶ 11.  Allocco and his associates expressed an interest in putting together a "family reunion" concert with Michael Jackson and his siblings, and Joe Jackson referred them to Frank Dileo.  Estate 56.1 ¶ 4; Pls.' 56.1 ¶¶ 37-38. There is no evidence that Jackson or his siblings were notified or aware of the meeting between their father and AllGood; in April 2009, Allocco told another employee of AllGood that Joe Jackson had not seen his son in two years.  Estate 56.1 ¶¶ 5-6.  Sometime within the next month, Allocco met with Dileo, along with another individual associated with Dileo, Mark Lamicka,[5] in Nashville, Tennessee.  Pls.' 56.1 ¶ 15.  Following this meeting, Allocco and Dileo signed the document at the center of this controversy.

The purported contract, alternatively called a "Binder Agreement" or "Letter of Intent" by the parties, is dated November 21, 2008, and was signed by Allocco and Dileo on November 25 and November 26, respectively.  Steinsapir Decl., Ex A. (hereafter "Binder Agreement" or "Binder") at 1.[6]  The document shows that Allocco signed on behalf of "AllGood Entertainment Inc," while Dileo signed on behalf of "Dileo Entertainment & Touring Inc."  *Id.* at 4.  The Binder states: "This letter of Intent [sic] sets forth our agreement and understanding as to the essential terms of the Live Performance of the Jackson Family … Dileo Entertainment & Touring Inc … in said production by AllGood Entrainment Inc./Patrick S. Allocco, CEO … engaged in said production of 'Jackson Family Reunion World Wide Event'."  Binder Agreement at 1.  It further

---

[4] The facts in this decision are drawn from undisputed facts submitted by the parties, and any disputes are noted. The Court takes note of the fact that Plaintiff submitted an untimely counter-statement of facts for this motion, which did not allow Defendants time to prepare any response.  While this "accident" is fairly typical of the way in which Plaintiffs' counsel has litigated this suit, I have taken his Rule 56.1 Counter-Statement into consideration to avoid unnecessary prejudice to his clients and to insure a decision on the merits.  *See, e.g., Cello Holdings, L.L.C. v. Lawrence-Dahl Co.*, 89 F. Supp. 2d 464, 469 (S.D.N.Y. 2000).

[5] Dileo Defendants dispute the characterization of Frank Dileo's relationship with Lamicka, and contend that they were never business partners or associated in any relevant way.  This issue is immaterial to my holding.

[6] The Binder Agreement is not paginated and has text in both numbered and unnumbered paragraphs.  For the sake of clarity, where text is quoted from unnumbered paragraphs, the actual page number will be provided.  In all other instances, the paragraph number and sub-letter (if applicable) will be cited.

states that the "Artist Price" is $24 million, which includes payment to a performer for an opening act, but does not specify how the funds will be divided. *Id.* ¶ 3. It did specify, however that $2 million was to be paid by AllGood to Dileo Entertainment & Touring Inc. "no later than on or before December 31st, 2008 to secure the Jacksons and show good faith" and provided that the funds would be refunded "if the deal cannot be completed," minus certain expenses and costs not to exceed $150,000. *Id.* ¶ 3(A). It also provided 120 days for Dileo Entertainment & Touring Inc. to acquire "written confirmation from all family members involved including Michael Jackson." *Id.* ¶ 3(B). The Binder also contained a paragraph titled "Non-competition" which provided that the "artists," would "agree not to consider or agree to perform on stage together prior to the Event and for a period of at least one year following the Event." *Id.* ¶ 6. No date was set for the event performance, except "TBD in 2009." *Id.* ¶ 1(b). The parties offer widely divergent interpretations of the document. Plaintiffs argue that it is an enforceable contract that required Jackson and his siblings to perform at a concert on a date in 2009 to be decided later, in consideration for $24 million. By contrast, Defendants assert that it is a letter of intent which was not binding, because it was predicated on the establishment of a later, more specific, contract for Jackson's performance. Defendants note that it was never signed by Jackson or any of his siblings, nor is there any language that purports to sign on their behalf. Estate 56.1 ¶¶ 23-25. AllGood admits that Jackson did not sign, but claims that prior drafts of the Binder Agreement did have language that authorized Dileo to sign for Jackson, and that such language was removed in the final version. Pls.' 56.1 ¶¶ 52-57.

  Also relevant to this dispute is a document titled "Confidentiality and Non Disclosure Agreement with Non Compete Clause for the Michael Jackson, Janet Jackson and Jackson Family Reunion World Event." Steinsapir Decl., Ex B (hereafter "Nondisclosure Agreement" or "NDA"). The agreement, signed on or about November 26, 2008, is signed by Allocco, Dileo, and other associates of the two men, Terry Harvey, Mark Lamicka, Ladd Biro, and James McGale. *Id.* at 3. None of the signature lines purport to authorize any of the individuals to sign on behalf of any other person or entity. *Id.* The NDA states in part, "[t]he undersigned individual acknowledges that the information contained in the Dileo Entertainment and Touring Agreement … dated November 25, 2008 by and between AllGood Concerts, LLC … and Dileo Entertainmnet and Touring, Inc … is confidential." *Id.* ¶ 1. It further states that the "purpose of disclosure" is "presenting the undersigned individual with certain valuable, confidential, and

propriety information." *Id.* ¶ 2.  The term is for eighteen months and appears to include confidentiality and noncompete clauses.  *See id.* ¶¶ 4, 11, 16.  This agreement was likewise not signed by Jackson or any of his siblings.  Estate 56.1 ¶ 27.

The planned Jackson Family concert extravaganza never came to be.  Plaintiff never paid any money by the December 31, 2008 deadline, nor thereafter.  Dileo 56.1 ¶ 5, 7.  No "written confirmation from all family members involved including Michael Jackson" was ever obtained by Dileo.  Estate 56.1 ¶ 32.  AllGood claims they worked diligently to raise the necessary funds in a timely fashion, but balked when they learned on or about December 22, 2008 that Mark Lamicka was being sued for fraud based on issues in a similar event promotion agreement.  Pls.' 56.1 ¶ 78-80, 82, 84-85.  Plaintiffs also claim that the December 31, 2008 date to provide the initial $2 million was extended to January 15, 2009, and further extended to January 31, 2009.  *Id.* ¶ 86-104.  AllGood claims they ultimately refused to pay any of the funds once they learned that Jackson, on or about January 28, 2009, signed an agreement to perform a series of concerts for another concert promoter, AEG.  Pls.' 56.1 ¶ 132; Estate 56.1 ¶ 38.  These planned concerts did not come to fruition either, as Jackson died on June 25, 2009.  Estate 56.1 ¶ 1.

On June 10, 2009, AllGood filed suit with this Court, and brought causes of action for breach of contract, promissory estoppel, and fraud against Dileo Defendants and Estate Defendant, as well as tortious interference with a contract against certain AEG entities.  AllGood amended its complaint on October 16, 2009.  On June 29, 2010, this Court dismissed the tortious interference and fraud claims, and dismissed the AEG defendants from the case.[7]  Defendants have now moved for summary judgment on the remaining causes of action.

## II.   ANALYSIS

### A.  Legal Standard

Summary judgment is warranted if the moving party shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  *See Cordiano v. Metacon Gun Club, Inc.*  575 F.3d 199, 204 (2d Cir. 2009); *see also* Fed.R.Civ.P. 56(c).  A material fact is one that will affect the outcome of the suit, and a dispute about a material fact occurs where there is sufficient evidence for a reasonable fact finder to return a

---

[7] Plaintiffs also sought a permanent injunction against Jackson, which was dismissed as moot.

verdict for the nonmoving party. *See, e.g., Sista v. CDC Ixis North America, Inc.*, 445 F.3d 161, 169 (2d Cir. 2006). Evidence must be viewed in a light most favorable to the non-moving party, and all inferences must be drawn in their favor. *See Cordiano*, 575 F.3d at 204. A party opposing summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading, but … must set forth specific facts showing that there is a genuine issue for trial." *Sista*, 445 F.3d at 169; Fed.R.Civ.P. 56(e). Where the non-moving party bears the burden of persuasion at trial, the moving party may satisfy its burden by "pointing out ... that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

### B. Breach of Contract

Tennessee law governs this lawsuit, and there, "a plaintiff seeking damages for an alleged breach of contract must prove: (1) the existence of an enforceable contract; (2) nonperformance amounting to a breach of the contract; and (3) damages caused by the breach of contract." *Ervin v. Nashville Peace & Justice Ctr.,* 673 F.Supp.2d 592, 612 (M.D. Tenn. 2009) (citing, *inter alia*, *Life Care Ctrs. of Am., Inc. v. Charles Town Assocs., Ltd.,* 79 F.3d 496, 514 (6th Cir. 1996); *BancorpSouth Bank, Inc. v. Hatchel,* 223 S.W.3d 223, 227 (Tenn. Ct. App. 2006)). Defendants argue that summary judgment is appropriate for two distinct reasons. First, they claim that the Binder Agreement was an unenforceable "agreement to agree." Second, Defendants assert that, even if the Binder is an enforceable contract, AllGood breached the contract first by failing to provide the payments obligated by the agreement, by the listed deadline or by any date thereafter. Estate Defendant joins this argument, and also seeks summary judgment on the ground that Jackson was never a party to the contract and never authorized Dileo or anyone else to sign a contract on his behalf.

#### 1. *Agreement to Agree*

When Defendants first argued on the motion to dismiss that this was an unenforceable "agreement to agree," I found significant force to their argument, but declined to dismiss at the pleading stage so as to obtain the benefit of a factual record. *See AllGood Entm't, Inc. v. Dileo Entm't & Touring, Inc.*, No. 09 Civ. 5377, 2010 WL 2606042, at *9 (S.D.N.Y. June 29, 2010). As previously noted in that opinion, under Tennessee law, "letters of intent" or agreements that leave substantial and necessary terms open for future negotiation are typically unenforceable.

*See, e.g, Four Eights, LLC v. Salem,* 194 S.W.3d 484, 486 (Tenn. Ct. App. 2005) ("the parties basically made an "agreement to agree" to something in the future, and such agreements have generally been held unenforceable, both in this jurisdiction and others"); *Golf Science Consultants, Inc. v. Cheng,* No. 3:07-CV-152, 2009 WL 1256664, at *4 (E.D. Tenn. May 4, 2009). Whether the contract is binding or is unenforceable is based on the terms of the contract and the intention of the parties. "The primary test as to the actual character of a contract is the intention of the parties, to be gathered from the whole scope and effect of the language used, and mere verbal formulas, if inconsistent with the real intention, are to be disregarded." *Gurley v. King,* 183 S.W.3d 30, 43 (Tenn. Ct. App. 2005) (quoting 17 Am. Jur. 2d *Contracts* § 1 (1964)); *see also Bolton v. Morgan,* No. 05-2315 MA/P, 2006 WL 840422, at *3 (W.D. Tenn. Mar. 29, 2006). With the benefit of discovery, my skepticism at the pleading stage has been confirmed, and both the plain language of the contract as well as evidence of the surrounding actions of the parties demonstrate that this was merely an "agreement to agree" that has no binding force.

"To determine whether the IPA constitutes preliminary negotiations or a contract, we look to the language used in the writing and the surrounding circumstances known to both parties." *German v. Ford*, 300 S.W.3d 692, 702 (Tenn. Ct. App. 2009). Referring to itself as a "letter of intent," the Binder is rife with language that contemplates further negotiations and additional agreements. *See S.K. Servs. v. FedEx Ground Package Sys., Inc.*, No. 1:08-CV-158, 2008 WL 5204067, at *3 (E.D. Tenn. Dec. 11, 2008); *German*, 300 S.W.3d at 704. The initial $2 million payment due on December 31, 2008 would be refunded "if the deal cannot be completed." Binder Agreement ¶ 3(A). All remaining funds would "be stipulated in Final agreement for Purchaser once all terms and conditions of this agreement are confirmed and signed." *Id.* Certain information was to be kept confidential, "unless and until the parties consummate the full contract of said production." *Id.* ¶ 7. As if this were not enough to highlight the preliminary nature of this negotiation, the Binder states near its end that, "[u]pon receipt of a signed copy of this letter, then we will proceed with full acting contract Agreement [sic] at a later agreeable date." *Id.* at 3.

In addition to language that contemplates a later agreement, the Binder leaves out material terms critical to a performance contract. The performance date is omitted, and only placeholders, such as "for a time period in 2009 that is acceptable to all members of the Jackson family" and "TBD in 2009," are included. Binder Agreement ¶ 1, 1(b). How the $24 million

6

payment would be divided between the artists (and opening act performer) is not included, nor is there any indication of how any of the parties would split the net revenues "from various revenue streams associated with the Event." *Id.* ¶¶ 3, 4.  How the parties would split royalties from things such as CD or DVD sales was also to be determined at a later date.  *Id.* ¶ 4.  "If the document or contract that the parties agree to make is to contain any material term that is not already agreed on, no contract has yet been made; the so-called 'contract to make a contract' is not a contract at all." *EnGenius Entm't, Inc. v. Herenton*, 971 S.W.2d 12, 17 (Tenn. Ct. App. 1997) (quoting 1 Arthur L. Corbin, et al., *Corbin on Contracts* § 2.8, at 133-34 (Rev. ed. 1993)). Plaintiff focuses on language that says the Binder is "binding and enforceable," and that it contains the "essential terms," but this elevates form over substance, and the substance of the document shows a manifestly incomplete arrangement.  Indeed, AllGood has no good response to the most damning open term: the lack of consent and authorization of the artists.  Neither Jackson nor his siblings signed the document, and there is no indication that Dileo was authorized to sign on their behalf, and at best scant evidence that he was even Jackson's manager at this point in time.  Further, the language in the Binder such as the 120 days to seek Jackson's "written confirmation" and payment "to secure the Jacksons and show good faith" make plain that the performers would need to agree to this arrangement sometime in the future.  Plaintiffs' claim that prior drafts contained language that purported to authorize Dileo to sign on Jackson and his siblings' behalf is irrelevant, both because AllGood signed the version that did not contain this language and because, at any rate, this fact alone is insufficient to demonstrate actual or apparent authority for Dileo to bind Jackson.  *See, e.g., Milliken Grp., Inc. v. Hays Nissan, Inc.* 86 S.W.3d 564,  569-70 (Tenn. Ct. App. 2002) ("Apparent authority must be established through the acts of the principal, rather than those of the agent.").  The plain language of the Binder indicates that further confirmation between AllGood, Dileo, and Jackson and his siblings would need to be reached before any final, binding, performance contract could be struck.  *See Barnes & Robinson Co., Inc. v. OneSource Facility Servs., Inc.*, 195 S.W.3d 637, 642 (Tenn. Ct. App. 2006) ("It is evident from the letters of intent that the parties agreed, when they established the framework for negotiations, that there would need to be a [later] agreement; otherwise the

deal was off and the down payment would be refunded and neither party would be liable to the other.").[8]

While the Binder itself plainly appears to be an unenforceable agreement-to-agree, courts should "seek to avoid the finding that an agreement is too uncertain to be enforceable by considering the surrounding circumstances and the conduct of the parties." *German*, 300 S.W.3d at 706.  Here, however, the surrounding circumstances and conduct serve only to confirm that the Binder was only a preliminary negotiation, and that AllGood themselves, through CEO Allocco, believed they still needed a future agreement with Jackson and his siblings.  Plaintiffs claim that the Binder bound Jackson to perform, and that the language about Jackson's "confirmation" only meant that Dileo Defendants "had to get the artist to confirm dates with written itineraries."  Pls.' 56.1 ¶¶ 71-73.  However, the documentary evidence Plaintiffs put forward to support this argument shows, quite to the contrary, that neither Alloccco and AllGood, nor the Dileo Defendants, believed that they had consummated a final agreement for Jackson to perform.

Beginning only a few days after the Binder was signed, in December 2008, Allocco emailed Mark Lamicka, the supposed partner of Frank Dileo, to "[g]et Frank working on this with Michael" because he was concerned about "someone running an end round on this."[9]  Ex. In Opp. To Defs.' Mot. for Sum. J. (hereafter "Pls.' Exhibits"), Ex. 22 (Dec. 1, 2008 email from Allocco to Lamicka).  Apparently working to gather entities to assist in putting on the concert, Allocco wrote to a fellow "AllGood Group" member, Steve Storch, *see* Pls.' 56.1 ¶ 10, that "the deal dies if MJ catches wind of any dealings with Sony" and that payment of the initial $2 million "is essential so that [Frank Dileo] can close the deal with Michael by demonstrating that the deposit funds are good."  Pls.' Exhibits, Ex. 22 (Dec. 12, 2008 email from Allocco to Storch).  Storch replied that they needed to provide the $2 million noted in the Binder and that they would

---

[8] AllGood invites the Court to compare the Binder Agreement to the performance agreement between Jackson and AEG to illustrate that it similarly left out certain "essential" items, yet appears to be a binding agreement.  Aside from the fact that the AEG agreement is not before me, and I need not decide whether Jackson's agreement with AEG is a valid contract in order to interpret the validity of the Binder Agreement, the comparison only bolsters the view that AllGood's agreement is lacking.  One need only flip through the twenty-eight page AEG contract and its detailed terms to see why the four page Binder is no more than an insufficient preliminary negotiation.  *See* Steinsapir Decl., Ex F. (hereafter "AEG Contract").  Most critically, the AEG Contract has the one thing AllGood could never obtain: the signature and written agreement of Michael Jackson himself.  AEG Contract at 14, 20, 25 (signature of Jackson in three locations).
[9] Allocco presumably meant "end run," an idiom that arises out of American football terminology regarding a play where the running back runs towards the sidelines rather than straight up the middle of the field.  The idiom essentially means to go around a usual line of authority.

still have to get "a solid entertainment attorney to make a good deal for AllGood." *Id.* (Dec. 12, 2008 email from Storch to Allocco). Later in December, Storch wrote to Allocco that "[Michael Jackson's] camp certainly seems interested in doing this…we may have an exclusive window open to us now but I would expect others will be jumping into the game if they haven't already. In other words…we need to close this as quickly as possible." *Id.* (Dec. 23, 2008 email from Storch to Allocco) (ellipses in original). In January 2009, Allocco continued to discuss "a post-jackson [sic] signed contract" whereupon Storch responded that Allocco should give Dileo Defendants "the old offer" and that the Dileo Defendants could perform their due diligence "up until 7 days after MJ signs the deal." *Id.* (Jan. 7, 2009 emails between Allocco, Storch and a third party). On January 12, 2009, Allocco wrote to Dileo and Lamicka to say that he was still having problems gathering the necessary funds "prior to getting a deal done with Michael." *Id.* (Jan. 12, 2009 email from Allocco to Dileo and Lamicka). By January 20, 2009, only eight days before the AEG agreement, Allocco forwarded an email from one of his investors to Dileo and others, which said that the investor would not move forward without "getting MJ's signature on a legal contract" or "until a legal contract between allgood [sic] and michael Jackson [sic] is signed." *Id.* (Jan. 20, 2009 email from "ron berger" to Allocco). Responses during this period from Dileo and Lamicka similarly indicated that no real agreement had been reached between the parties. Taken together, "[t]he parties' communications … further evidence their intent for further negotiations and the lack of mutual assent" as to the details of the purported performance agreement. *Golf Science*, 2009 WL 1256664, at *5; *see also EnGenius*, 971 S.W.2d at 17 ("the parties … contemplated the subsequent execution of a [further] formal contract"). The surrounding circumstances of this failed endeavor confirms what the plain language of the Binder indicated: that it was merely a preliminary negotiation subject to the agreement of the artists and negotiation of other material terms. As such, the Binder is unenforceable and no breach can be found as a matter of law.

### 2. *AllGood Breached First*

Even if I were to ignore the clear evidence that the Binder was an agreement subject to a future final agreement, AllGood's breach of contract claim would still fail because they beached the contract first. "A party who has materially breached a contract is not entitled to damages stemming from the other party's later material breach of the same contract. Thus, in cases where both parties have not fully performed, it is necessary for the courts to determine which party is

chargeable with the first uncured material breach." *Lee Masonry, Inc. v. City of Franklin*, No. M2008-02844-COA-R3-CV, 2010 WL 1713137, at *9-10 (Tenn. Ct. App. Apr. 28, 2010) (quoting *McClain v. Kimbrough Constr. Co., Inc.,* 806 S.W.2d 194, 199 (Tenn. Ct. App. 1990)); *see also United Brake Sys., Inc. v. Am. Envtl. Prot., Inc.*, 963 S.W.2d 749, 756 (Tenn. Ct. App. 1997) ("[T]here can be no recovery for damages on the theory of breach of contract by the party who himself breached the contract."). There is no dispute that AllGood failed to pay any of the funds by the deadlines delineated in the Binder, due "on or before December 31, 2008" and well before any alleged breach by Defendants, nor did Plaintiff pay any of the promised funds at any point thereafter. AllGood tries to excuse this breach by arguing that they were not notified of the breach, or in the alternative, that the agreement was modified and the time to pay extended to January 31, 2009, conveniently a few days after the AEG contract with Jackson. Once again there is not a scintilla of evidence to support any extension. At most, the emails from Lamicka and Dileo highlight their exasperation with Allocco's failure to pay in a timely fashion, and even Allocco himself in mid-January 2009 acknowledge that a refusal by Dileo to respond to his communications is "his way of saying don't call again til [sic] you have the money." Pls.' Exhibits, Ex. 22 (Jan. 13, 2009 email from Allocco to Storch).

With respect to notice, while AllGood may not have received a formal notice of breach, there is no question that Allocco and Plaintiffs knew that they were obligated to pay by December 31, 2008 and had failed to do so, and in any event a number of "written" emails from Dileo and Lamicka remind Allocco that AllGood had failed to provide money by the agreed-upon date. *See, e.g.,* Pls.' Exhibits, Ex. 22 (Jan. 6, 2009 email from Lamicka to Allocco; Jan. 14, 2009 email from Lamicka to Allocco). AllGood, through Allocco, was aware that they were in breach by not providing the funds by the deadline, and were notified in writing, however informally, about the breach. *See McClain,* 806 S.W.2d at 198 (notice requirement arises where information is in the "peculiar control of one party"); *see also Greeter Const. Co. v. Tice*, 11 S.W.3d 907, 911 (Tenn. Ct. App. 1999) (both parties aware of breached condition and, in any event, record evidence provides sufficient written notice).[10]

---

[10] To the extent Plaintiffs had a breach of contract claim based on the NDA document, this too must be dismissed. The NDA was not signed by Jackson or his siblings, and there is no evidence that it was ever breached by any of the Defendants. Indeed, AllGood does not even bother to muster a defense in support of this claim.

### C. Promissory Estoppel

"Promissory estoppel is based on 'a promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.'" *Barnes*, 195 S.W.3d at 645 (quoting *Calabro v. Calabro,* 15 S.W.3d 873, 878 (Tenn.Ct.App.1999)); *see also Owen of Georgia, Inc. v. Shelby County*, 648 F.2d 1084, 1095 (6th Cir. 1981). In an abundance of caution I allowed this cause of action to survive the motion to dismiss and await discovery, but it is now beyond peradventure that such a cause of action cannot survive. The doctrine or promissory estoppel is limited: "(1) the detriment suffered in reliance must be substantial in an economic sense; (2) the substantial loss to the promisee in acting in reliance must have been foreseeable by the promisor; [and] (3) the promisee must have acted reasonable in justifiable reliance on the promise as made." *Barnes*, 195 S.W.3d at 645 (emphasis omitted). Under Tennessee law, the doctrine is not to be applied liberally, but rather is limited to "exceptional cases," and "are found only where defendant's conduct is akin to fraud." *Anderson v. Vanderbilt University*, No. 3-09-0095, 2010 WL 2196599, at *15 (M.D. Tenn. May 27, 2010) (quoting *Sparton Technology, Inc. v. Util-Link, LLC,* 248 Fed. Appx. 684, 689 (6th Cir.2007)); *see also Barnes*, 195 S.W.3d at 645.

Here, Plaintiff's promissory estoppel claim is clearly insufficient. While neither AllGood nor Dileo acquitted themselves particularly well in their interactions with one another, there is no evidence that Defendants' actions were "akin to fraud." Rather, as the emails illustrate, *supra*, any promises relied upon was unenforceably vague because there was no meeting of the minds between the parties as to material aspects of the agreement. *See, e.g., Amacher v. Brown-Forman Corp.,* 826 S.W.2d 480, 482 (Tenn. Ct. App. 1991)("the resulting promise must be unambiguous and not unenforceably vague"). Given the fact that Allocco knew that they still needed Jackson's agreement to put on any concert, and that Dileo Defendants were not going to move forward without payment, it was entirely unreasonable to rely on any supposed promise. In addition to the fact that any reliance was unreasonable, Plaintiffs fail to provide any evidence of substantial economic damage that it suffered as a result of relying on any promise offered by Defendants. "No injustice arises in the refusal to enforce a promise where either the loss induced is negligible or the promisee's reliance is not reasonable." *Barnes*, 195 S.W.3d at 645.

11

**D. Motion for Reconsideration**

Plaintiffs also moved, in an untimely fashion, for reconsideration of my prior dismissal of the fraud and tortuous interference claims. For all the reasons described in Defendants' papers, that motion is denied.

### III.  CONCLUSION

For the reasons described above, Defendants' motion for summary judgment is GRANTED, and this case is DISMISSED.

The Clerk of the Court is instructed to close this case and remove it from my docket.

SO ORDERED
August 19, 2010
New York, New York

_____
Hon. Harold Baer, Jr.
U.S.D.J.